## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | |
|---|---|
| **NATHAN ARRIES,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| *v.* | ) |
| | ) |
| **CITY OF RICHMOND,** | ) |
| | ) **Civil Action No.: 3:21-cv-85** |
| **and** | ) |
| | ) |
| **WILLIAM SMITH,** | ) |
| **in His Individual Capacity,** | ) |
| | ) |
| *Defendants.* | ) |

## COMPLAINT
### (Jury Trial Requested)

COMES NOW, the Plaintiff, Nathan Arries, by counsel, and hereby files his Complaint against Defendants City of Richmond and William Smith ("Smith"), and in support thereof, Plaintiff states as follows:

### INTRODUCTION

1.      This action arises from unlawful conduct of officers, employees, and agents of the Richmond City Police Department on Monday, June 1, 2020, between approximately 7:32 and 7:42 p.m. In particular, the officers, employees, and agents of the Richmond City Police Department used intentional, unjustified, and inexcusable force and threats of force to disperse citizens who had assembled near the Robert E. Lee Monument in Richmond, Virginia, to exercise their First

1

Amendment rights through a peaceful demonstration—a demonstration protesting, *inter alia*, police violence, police militarization, the lack of police accountability, systemic racism in policing, and the extra-judicial killings by police of African-Americans. The protest arose in the aftermath of the murder of George Floyd by officers of the Minneapolis Police Department, but was directed in part against local injustices, including those perpetrated by the City of Richmond Police Department.

2.     The force and threats of force used by the police to disperse this assembly included but were not limited to aiming assault rifles and other firearms at the assembly, deploying tear gas and pepper spray against the assembly, use of batons, and marching with arms and armor through the assembly area.

3.     This suit brings claims for a violation of civil rights protected by the Constitution of the United States, as well as for state-law tort claims. The plaintiff seeks declaratory relief, compensatory damages as well as punitive and exemplary damages for the Defendants' violations of his Constitutional rights, and compensatory and punitive damages for the tortious conduct.

## VENUE AND JURSIDICTION

4.     This Court has subject matter jurisdiction over the Plaintiff's claims pursuant to 28 U.S.C. § 1331. This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57.

5.     Venue is proper in the Richmond Division of the Eastern District of Virginia pursuant to 28 U.S.C. §§ 127, 1391 and Local Civil Rule 3, as a substantial part of the events giving rise to the claims herein occurred in the City of Richmond.

## PARTIES

6.      Plaintiff Nathan Arries is a citizen of the United States and resident of Virginia, who participated in a demonstration on June 1, 2020, that culminated at the Monument of Confederate General Robert E. Lee ("Lee Monument"), where it was dispersed by officers, agents, and employees of the Richmond Police Department between approximately 7:32 and 7:42 p.m.

7.      Defendant City of Richmond ("the City") is responsible for the oversight, administration, education, training and management of the Richmond City Police Department and its individual officers, including officers Doe A-X. The City is responsible for ensuring that proper training, policies and procedures are in place to prevent the unnecessary violation of the constitutional rights of those with whom Richmond police officers come into contact. The City is required by law to ensure the protection of the constitutional rights of all persons who come into contact with the Richmond City Police, including officers Doe A-X. In particular, The City was responsible for ensuring that the Police Department for the City of Richmond and its officers did not deliberately and maliciously interfere with the rights of citizens and residents of the City of Richmond to lawfully and peacefully assemble, speak and petition the government for a redress of grievances. The City is responsible for ensuring that those under his command do not violate citizens' Fourth Amendment rights by use of excessive force.

8.      Defendant William Smith ("Smith") was Chief of Police for the City of Richmond from June of 2019 until June 16, 2020, when he resigned at the request of

Levar Stoney, Mayor of the City of Richmond. As Chief of Police Smith was responsible for the oversight, administration, education, training and management of the Richmond City Police Department and its individual officers, including officers Doe A-X. Smith was responsible for ensuring that proper training, policies and procedures are in place to prevent the unnecessary violation of the constitutional rights of those with whom Richmond police officers come into contact. Smith was required by law to ensure the protection of the constitutional rights of all persons who come into contact with the Richmond City Police, including officers Doe A-X. In particular, Smith was responsible for ensuring that the Police Department for the City of Richmond and its officers did not deliberately and maliciously interfere with the rights of citizens and residents of the City of Richmond to lawfully and peacefully assemble, speak and petition the government for a redress of grievances. Smith is responsible for ensuring that those under his command do not violate citizens' Fourth Amendment rights by use of excessive force.

9.      Officers Doe A-X were officers of the Richmond Police Department who on June 1, 2020 deliberately and maliciously interfered with the rights of citizens and residents of the City of Richmond, including Plaintiff Arries, to lawfully and peacefully assemble, speak and petition the government for a redress of grievances.

10.     The Plaintiff is currently unaware of the names and identities of officers Doe A-X. Generally, however officers Doe A-X may consist of the following persons:

    a.  Any officer, employee, or agent of the Richmond Police Department who took action, by openly aiming their firearms at the assembly, threatening

4

the assembly at Lee Circle on June 1, 2020, between approximately 7:32 and 7:42 p.m. as described herein.

b.  Any officer, employee, or agent of the Richmond Police Department who took action, by using their weapons or munitions, to disperse the assembly at Lee Circle on June 1, 2020, between approximately 7:32 and 7:42 p.m. as described herein.

c.  Officers, employees, or agents of the Richmond Police Department who took action, by advancing through the grounds of the assembly while armed, to disperse the assembly at Lee Circle on June 1, 2020, between approximately 7:32 and 7:42 p.m. as described herein, after the initial assault using tear gas.

d.  Officers, employees, or agents of the Richmond Police Department who were present and encouraged others to use violence or threats of violence to disperse the assembly at Lee Circle on June 1, 2020, between approximately 7:32 and 7:42 p.m. as described herein.

e.  Officers, employees, or agents of the Richmond Police Department who knew or should have known that their fellow officers were violating, or were intending to violate, the constitutional rights of the members of assembly described herein, had reasonable opportunity to prevent the harm, and chose not to act to prevent the harm.

f.  Supervisors and other agents of the Richmond Police Department of the foregoing officers Doe A-X who planned or authorized the conduct described herein.

g.  Supervisors of the foregoing officers Doe A-X who had actual or constructive knowledge that their subordinate(s) were, or were intending, to engage in conduct that poses a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the conduct, which inaction was an affirmative cause of the constitutional injury.

11.  The defendants are joined, pursuant to Federal Rule of Civil Procedure 20, as the claims against the defendants arise from the same occurrence or series of occurrences.

12.  Plaintiff was present at Lee Circle (to include the enclosed park, the street, and the immediately adjacent road verge and sidewalks) in Richmond, Virginia, on June 1, 2020, to engage in a protected, First Amendment activity, and who witnessed, and was injured by or threatened by, the acts of violence or threats of violence perpetrated by Richmond Police officers, employees, or agents, at any time in the ten minute period beginning when Richmond Police openly aimed firearms at the gathered assembly at approximately 7:32 p.m.

## FACTS

13.  On Monday, June 1, 2020, a large number of concerned individuals initiated a peaceful assembly in Richmond, Virginia, in accordance with their rights enshrined in the First Amendment to the Constitution of the United States, in

6

response to the extra-judicial killings of persons of color by American law enforcement, highlighted by the death of George Floyd, and in response to the excessive force that such American law enforcement has often deployed against its citizens. Plaintiff Nathan Arries joined and participated in this assembly and demonstration.

14.     The assembly began at Monroe Park. The apparent organizers of the assembly took extraordinary, public steps, at the beginning and repeatedly throughout the course of the assembly, to help to ensure that this assembly and demonstration would be peaceful, nonviolent, and nondestructive of private or public property. The efforts included repeated, explicit direction during the public speeches of the nonviolent and nondestructive goals of the demonstration; use of self-policing to identify individuals that may become disorderly and addressing those concerns promptly; use of chants throughout the assembly to redirect emotions away from anger and toward nonviolence and nonaggression; making use of a police escort; and allowing police presence in and around the assembly. The demonstrators of the assembly were in agreement with the nonviolent and nondestructive goals of the demonstration and complied with these directions. This all distinguished the assembly from the previous protests of Friday, May 29, and Saturday, May 30, 2020.

15.     In the late afternoon of Monday, June 1, 2020, the assembly began its journey from Monroe Park to the Capitol. At no time during this movement was the assembly violent or destructive of public or private property. It then returned to Monroe Park, and proceeded with a full police escort provided by the Richmond Police

Department, along a route that Richmond Police Department had cleared for this purpose.

16.     The assembly, with its Richmond Police Department escort, proceeded from Monroe Park along Grace Street to Second Street, to Main Street, to Monroe Park, and then to Franklin Street and to the Confederate General J. E. B. Stuart monument. ("Stuart Monument"). This movement took approximately an hour, and at no time during this movement was the assembly violent or destructive of public or private property. Along this route, the assembly was chanting, and some of these chants were explicitly anti-police and anti-Richmond Police Department, though they did not advocate violence.

17.     The assembly then congregated around the eastern side of the Stuart Monument to hear speakers discuss the issues of the day. During this gathering around the Stuart Monument, the speakers reiterated that the assembly was to be non-violent and was not to destroy any property (private or public), and the assembly complied. At no time did the assembly turn violent, threaten to turn violent or begin to destroy public or private property, and at no time did this assembly attempt to destroy, deface or harm the Stuart Monument.

18.     After approximately half an hour, the assembly, with their Richmond Police Department escorts, proceeded west on Monument Avenue approximately one quarter of a mile to the Lee Monument, on Lee Circle, where it again assembled on the east side of the Lee Monument to hear more speakers. The assembly at the Lee Monument was peaceful, there were no threats of violence, and none of the assembly

at the Lee Monument was destroying or attempting to destroy or deface any public or private property or the Lee Monument.

19.     At approximately 7:31 p.m.—that is, almost a full half hour prior to the curfew— members of the Richmond Police Department, acting without provocation or warning, appeared in a convoy of vehicle, moving down Monument Avenue from the northwest, toward Lee Circle.  They then established a skirmish line along the northwestern side of Lee Circle. This skirmish line was heavily armed and armored, wearing body armor and masks, and most had AR-style assault weapons and their side-arms.

20.     Beginning within a minute after arriving on the scene, and at approximately 7:32 a.m., several of the Richmond Police Department assumed aggressive shooting stances, and trained their rifles or sidearms in the assembly, causing many in the peaceful assembly that witnessed this, including Plaintiff Arries, to fear these armed individuals were about to fire upon them.

21.     The City of Richmond was, at this time, under a curfew prohibiting any person from being on "any street, road, alley, avenue, park, or other public place between the hours of 8:00 p.m. to 6:00 a.m. beginning May 31, 2020 and ending on June 3, 2020."

22.     This threat of imminent physical injury caused some in the assembly to terminate their exercise of their First Amendment activities and depart the scene. Other members of the assembly, shocked at the sudden, unprovoked display of aggression by Richmond Police Department, which appeared to have led the assembly

into the ambush, and recognizing the infringement of their rights, moved from the east side of the Lee Monument  to its west side, maintaining a safe and respectful distance of tens of yards from the Richmond Police skirmish line, and began to object to this excessive show of force, shouting that the assembly was and had been peaceful, that the curfew was not in effect for another half an hour, and chanting "Hands-up— Don't shoot," with arms raised to unequivocally and visibly demonstrate the peaceful nature of the current protest and to show that the assembly was protesting but not threatening the officers.

23.    About three minutes after the police began their deployment, an armored vehicle with additional armed and armored officers, employees, or agents of the Richmond Police, with gas masks, body armor, and assault weapons, arrived from along the northeast side of the circle.

24.    About thirty seconds after the armored vehicle arrived, a gray pickup truck with additional police arrived. As it did, and without provocation or warning, Officer Doe A, a member of the Richmond Police Department threw tear-gas canisters into the assembly, quickly followed by other officers, Officers Doe B-X, even as many of the assembly, particularly those in front, were kneeling with their hands in the air chanting, "hands-up don't shoot." Many remaining in the assembly, including Plaintiff Arries, were affected by the tear gas, which caused severe irritation of the skin, eyes, mouth, throat, and lungs. Others in the crowd, including Plaintiff Arries, feared injury from the police and the unnecessary, unprovoked and brutal use of the

tear gas. As a result, many in the assembly withdrew, terminating their exercise of their First Amendment rights.

25.     During the three to four minutes since arriving, the police had adequate time to assess the peaceful nature of this protest, to give directions or warnings to the assembly, and to determine that any alleged illegal conduct, such as permanent damage to the Lee Monument, was not occurring and had not in fact occurred. Further, if more time had been needed, the police could have taken more time, as there was no apparent need to launch this attack.

26.     As Officers Doe A-X continued to deploy canisters of tear gas in Lee Circle, forcing those remaining in the assembly to the perimeter, and providing thick, white, poisonous smoke as coverage for the members of the Richmond Police Department, Officers Doe A-X, members of the Richmond Police Department, wearing gas masks stormed through Lee Circle and attacked any remaining protesters, using both OC pepper spray and batons.

27.     This action caused those remaining around the Lee Monument and the adjacent area, including Plaintiff Arries, to disperse and to terminate their exercise of their First Amendment Rights.

28.     Additionally, as the police moved into Lee Circle, other members of the Richmond Police Department on the east of Lee Circle also fired into the assembly.

29.     Within approximately two minutes of the initial assault with tear gas, Lee Circle was substantially cleared by the police of all peaceful demonstrators.

Officers Doe A-X fired gas at the remnants of the assembly as the demonstrators, including Plaintiff Arries, dispersed, and the police used a pursuit-by-fire tactic.

30.    In launching the attacks from both the northwest and the east, the Richmond Police appeared to be using a variant on an L-shaped ambush tactic common in military conflicts around the world.

31.    The use of an "L" ambush is a common military tactical maneuver designed and intended to trap the assembly in a "kill zone" and leave the ambushed with only two options: first, to be maximally exposed to the assault and the concomitant flanking and enfilading fire that the ambush provides; or second, to counter such a tactical maneuver by assaulting through the ambush established-- that is, a frontal assault against one of the two legs of the "L" ambush to neutralize one of the fields of fire. The tactic therefore seems designed to maximize the effect of the ambush when the law enforcement deployed violence, and even to encourage the assembly to become violent (which the assembly did not) as a means of excusing police retaliation.

32.    At no time prior to the ambush was the assembly at the Lee Circle, including Plaintiff Arries, violent.

33.    At no time prior to the ambush at the Lee Circle, including Plaintiff Arries, commit any property destruction.

34.    At no time prior to the ambush did the assembly at the Lee Circle, including Plaintiff Arries, attempt to damage, deface, or destroy the Monument or other public or private property.

35.     On or around 8:11 p.m., after the ambush by Officers Doe A-X, and recognizing the grave illegality of their actions, the Richmond Police Department took to Twitter to begin a disinformation campaign to create a false narrative for the populations of Richmond, Virginia, the United States and the world who were watching, alleging the Richmond Police Department was forced to gas the assembly at the Lee Monument  because "some RPD officers in that area were cut off by violent protestors" and that the "gas was necessary to get them to safety."

36.     This tweet was patently false.

37.     The assembly at Lee Circle, including Plaintiff Arries, was not violent, and the assembly was not cleared to allow RPD officers' a means of escape to safety. In fact, the tear gas was launched upon the arrival of the gray truck with police lights, which, upon information and belief, was the command structure. Pins had been pulled from tear gas cannisters prior to the arrival of the gray truck. The Richmond Police Department and the Mayor's office have subsequently recanted their initial and false tweet regarding the necessity of gassing the assembly, now acknowledging that the members of the Police Department on the scene acted outside of written department protocols.

38.     At approximately 9:47 p.m., Richmond Police tweeted, "Chief Smith just reviewed video of gas being deployed by RPD officers near the Lee Monument and apologizes for this unwarranted action. These officers have been pulled from the field. They will be disciplined because their actions were outside dept protocols and directions given."

39.     The Mayor of Richmond has admitted that the actions of Officers Doe A-X "violated [the] rights" of those assembled.

40.     In fact, and upon information and belief, the defendants and Officers Doe A-X were motivated by actual malice against the assembly, and/or the desire to exact revenge on the assembly at the Lee Monument for the actions of previous separate protests, and/or the desire to retaliate against the assembly for protesting against police misconduct generally, and the misconduct of the Richmond Police Department, specifically.

41.     Plaintiff Nathan Arries moved to Richmond in 2016 and has resided in the area since then. Nathan Arries has a history of active involvement in organizing protest activities directed against racial inequalities. He attended this event to advocate against police violence. Arries joined the assembly at Monroe Park before it left for the Capitol. Arries saw the group actively self-policing to ensure that it remained nonviolent. Arries heard and participated in chants such as "What are we here for—Love!" to discourage violence and property destruction. Throughout the course of the assembly, Arries witnessed no violence, no property destruction, and no threats of violence or property destruction by members of the assembly.

42.     As the members of the Richmond Police Department, including Officers Doe A-X, deployed with arms and armor, several white demonstrators, in the apparent belief that police officers are less likely to fire unjustly on a crowd that is led by white allies, pushed their way through the crowd to get to the front and raised their hands, to place themselves between the police and black demonstrators in the

14

assembly. Seeing how the officers were escalating the violence, demonstrators in the assembly expected to hear the officers give directions for the assembly to disperse, or to give warnings that tear gas was about to be used, but no warnings came. As the officers launched the initial tear gas, Arries and other people began chanting to the police words to the effect that, "The curfew does not begin until 8! What are you doing here?"

43.   Plaintiff Arries determined to remain as others in the assembly line retreated. A police officer pointed a weapon at Arries, and Arries was hit by tear gas or pepper spray.

44.   As more tear gas was launched, Arries felt its effects, as it began to burn his eyes and mouth. Only then did he decide to terminate the exercise of his First Amendment activities. Arries has suffered from glaucoma since early childhood and has very poor peripheral vision. When he was hit by tear gas or pepper spray, he was unable to see at all. Somebody helped him either with milk or water to flush the burning substance from his eyes.

45.   Arries was blinded and felt his skin, eyes, nose, mouth and lungs burn, causing coughing and difficulty breathing. He rushed home and arrived at his apartment before 8:00 p.m., before the curfew began. It took several days for the burning to stop completely.

**CLAIMS FOR RELIEF**
**COUNT I – VIOLATION OF THE FIRST AMENDMENT**
**Seeking Declaratory Relief, and Compensatory and Punitive Damages**
**(Against all Defendants, jointly and/or severally)**

46.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

47.    42 U.S.C. § 1983 provides, in pertinent part, that: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

48.    Plaintiff Arries is a "citizen of the United States or other person within the jurisdiction thereof." Does A-X are "persons" for the purpose of 42 U.S.C. § 1983.

49.    The Plaintiff was present at Lee Circle to engage in expressive activity, protected by the First Amendment of the United States Constitution, which was made applicable to the states by the Fourteenth Amendment, in a traditional public forum.

50.    Officers Doe A-X, at all relevant times herein, were acting under the color of state law.

51.    At the time of the events complained of herein, the Plaintiff had a clearly established constitutional right under the First Amendments of the United States Constitution, as applied to the states under the Fourteenth Amendment, to peaceably assemble and to engage in expressive activities, without retaliation by the police through a use of force or through conduct that intimated the threat of an imminent

use of force, other than force for purpose of making an arrest supported by probable cause.

52.     Furthermore, supervisors and other agents of the Richmond Police Department who planned, authorized, ratified, or condoned the conduct described herein are equally liable as those participating in this conduct; as are officers, agents, or employees of the Richmond Police Department who had actual or constructive knowledge that others were, or were intending, to engage in conduct that poses a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the unlawful conduct, which inaction was an affirmative cause of the constitutional injury.

53.     Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions of federal courts concerning these rights at the time of the events complained of herein (as the law was clearly established at that time), that his or her conduct violated the Plaintiff's clearly established First Amendment rights. Therefore, Defendants and Officers Doe A-X are not entitled to qualified immunity.

54.     The acts of Defendants and Officers Doe A-X, as described herein, involved the use of force and conduct that intimated the threat of an imminent use of force, for purposes other than making an arrest supported by probable cause, in retaliation for protected First Amendment activity.

55.   A similarly situated reasonable person would have been deterred in the exercise of his or her First Amendment activity by the conduct of Defendants and Officers Doe A-X. In fact, the Plaintiff Arries was deterred in his exercise of his First Amendment activity.

56.   Defendants and Officers Doe A-X acted intentionally, willfully and wantonly, and in gross and reckless disregard of the Plaintiff's rights.

57.   Declaratory judgment that the conduct of the Defendants violated the First Amendment rights of the Plaintiff and similarly situated individuals is appropriate.

58.   Compensatory damages are appropriate inter alia for the physical and emotional injuries, and the chilling effect of the defendants' conduct, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiff as a direct and proximate result of the Defendants' conduct in violation of the Plaintiff's First Amendment rights.

59.   Punitive damages are appropriate as to all or some of the Defendants, as the conduct of at least some of the Defendants showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiff's rights.

60.   An award of costs and attorney fees, pursuant to 42 U.S.C. § 1983, is appropriate.

61.   As the Supreme Court of the United States has stated, "a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen and thus be less likely to respond belligerently to fighting

words" even in the midst of an assembly whose grievances are directed at their actions.

### COUNT II – VIOLATION OF THE FOURTEENTH AMENDMENT
### Seeking Declaratory Relief, and Compensatory and Punitive Damages
### (Against all appropriate Defendants, jointly and/or severally)

62. Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

63. 42 U.S.C. § 1983 provides, in pertinent part, that: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

64. Plaintiff is a "citizen of the United States or other person within the jurisdiction thereof." Does A-X are "persons" for the purpose of 42 U.S.C. § 1983.

65. Defendants and Officers Doe A-X, at all relevant times herein, were acting under the color of state law.

66. At the time of the events complained of herein, Plaintiff had a clearly established constitutional rights under the Fourteenth Amendment of the United States Constitution, to be free of arbitrary state-actor conduct that deprives an individual of bodily integrity. *Doe v. Rosa*, 795 F.3d 429, 436-37 (4th Cir. 2015). Under the circumstances, the use of tear gas, OC pepper spray, batons, and the like

constitute an invasion of bodily security through a "means so brutal, demeaning, and harmful" as to be shocking to the conscience. *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980).

67.   Furthermore, supervisors and other agents of the Richmond Police Department who planned, authorized, ratified, or condoned the conduct described herein are equally liable as those participating in this conduct; as are officers, agents, or employees of the Richmond Police Department who had actual or constructive knowledge that others were, or were intending, to engage in conduct that poses a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the conduct, which inaction was an affirmative cause of the constitutional injury.

68.   Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions surrounding the Fourteenth Amendment case law concerning these rights at the time of the events complained of herein, as the law was clearly established at that time, that their conduct violated the Plaintiff's clearly established Fourteenth Amendment rights. Therefore, Defendants and Officers Doe A-X are not entitled to qualified immunity.

69.   The acts of Defendants and Officers Doe A-X, as described herein, involved the use of arbitrary state-actor conduct that deprived Plaintiff of his right to bodily integrity. Under the circumstances, the use of tear gas, OC pepper spray,

batons, and the like constitute an invasion of bodily security through a "means so brutal, demeaning, and harmful" as to be shocking to the conscience.

70.    Defendants and Officers Doe A-X acted intentionally, willfully and wantonly, in gross and reckless disregard of the Plaintiff's rights.

71.    Declaratory judgment that the conduct of the Defendants and Officers Doe A-X violated the Fourteenth Amendment rights of the Plaintiff is appropriate.

72.    Compensatory damages are appropriate inter alia for the physical and emotional injuries, as well as any out-of-the-pocket expenses or lost income, incurred by Plaintiff as a direct and proximate result of the Defendants' conduct in violation of the Plaintiff's Fourteenth Amendment rights.

73.    Punitive damages may be appropriate as to all or some of the Defendants, as the conduct of at least some of the Defendants showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiffs' rights.

74.    An award of costs and attorney fees, pursuant to 42 U.S.C. § 1983, is appropriate.

## COUNT III – VIOLATION OF THE FOURTH AMENDMENT
### Seeking Declaratory Relief, and Compensatory and Punitive Damages
### (Against all appropriate Defendants, jointly and/or severally)

75.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

76.    This is a Fourth Amendment excessive force claim. It is pled on the belief that some of the Defendants and Officers Doe A-X may attempt to justify their conduct as an attempt to arrest or detain individuals, or otherwise in a manner that

brings the use of force within the parameters of the Fourth Amendment, rather than the Fourteenth Amendment directly.

77.     42 U.S.C. § 1983 provides, in pertinent part, that: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

78.     Plaintiff is a "citizen of the United States or other person within the jurisdiction thereof." Defendants and Officers Doe A-X are "persons" for the purpose of 42 U.S.C. § 1983.

79.     Defendants and Officers Doe A-X, at all relevant times herein, were acting under the color of state law.

80.     At the time of the events complained of herein, Plaintiff had clearly established constitutional rights under the Fourth Amendment of the United States Constitution, to free of arrest without probable cause, and to be free of the use of excessive force in the attempt to execute an arrest or detention.

81.     Furthermore, supervisors and other agents of the Richmond Police Department who planned, authorized, ratified, or condoned the conduct described herein are equally liable as those participating in this conduct; as are officers, agents, or employees of the Richmond Police Department who had actual or constructive

knowledge that others were, or were intending, to engage in conduct that poses a pervasive and unreasonable risk of constitutional injury to citizens, and whose response to that knowledge was so inadequate as to show deliberate indifference or tacit authorization of the conduct, which inaction was an affirmative cause of the constitutional injury.

82.     Any reasonable police officer knew or should have known, by virtue of his or her training and experience and the case law and opinions surrounding the Fourth Amendment case law concerning these rights at the time of the events complained of herein (as the law was clearly established at that time), that their conduct violated the Plaintiff's clearly established Fourth Amendment rights. Therefore, Defendants and Officers Doe A-X are not entitled to qualified immunity.

83.     To the extent that the acts of Defendants and Officers Doe A-X, as described herein, fall within the parameters of the Fourth Amendment, the conduct of all or some of the Defendants and Officers Doe A-X involved the unlawful use of force against Plaintiff in an attempt to arrest without probable cause, or otherwise excessive force to make a lawful arrest.

84.     The assembly was peaceful and lawful, and it was even conducted under police escort. There was no probable cause for arrest.

85.     To the extent that some Defendants believed that there was cause for arrest, it is averred that the force used exceeded the force that was objectively unreasonable. For instance, any offense that was supported by believe of probable cause was a minor offense; the assembly, being without obvious weapons of

significance, and having demonstrated its peaceful intent, even to the point of many with their arms raised, were not an apparent threat against heavily armed, body-armor-clad, gas-mask wearing officers; the assembly was not actively resisting arrest, and there were multiple heavily armed officers and the SWAT team present at the time the Defendants decided to use force.

86.     Defendants and Officers Doe A-X acted intentionally, willfully and wantonly in gross and reckless disregard of the Plaintiff's rights.

87.     Declaratory judgment that the conduct of the Defendants violated the Fourth Amendment rights of the Plaintiff is appropriate.

88.     Compensatory damages are appropriate inter alia for the physical and emotional injuries, as well as any out-of-the-pocket expenses or lost income, incurred by the Plaintiff as a direct and proximate result of the Defendants' conduct in violation of the Plaintiff's Fourth Amendment rights.

89.     Punitive damages may be appropriate as to all or some of the Defendants, as the conduct of at least some of the Defendants showed actual malice, willful and wanton, or gross and reckless disregard of the Plaintiff's rights.

90.     An award of costs and attorney fees, pursuant to 42 U.S.C. § 1983, is appropriate.

### COUNT IV – ASSAULT
### Seeking Compensatory and Punitive Damages
### (Against all appropriate Defendants, jointly and/or severally)

91.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

92.    The intentional acts of violence and intentional actions intimating threats of violence by the defendants, to include training firearms on Plaintiff, the use of tear gas, the use of OC pepper spray and batons, and the armed and aggressive march through the grounds of the assembly, reasonably put Plaintiff in fear of an imminent, harmful or offensive touching, without justification or excuse.

93.    Those Defendants that were present and encouraged the assault are equally liable for the assault.

94.    Those Defendants that were not present, but who planned, authorized, ratified, or condoned the assault are equally liable for the assault.

95.    Any actions taken by some demonstrators, such as tossing the tear gas cannisters back, was reasonable self-defense or defense of others, as the actions were taken in response to an unprovoked assault or battery, and the conduct of the Defendants was not supported by probable cause.

96.    To the extent the Defendants were trying to conduct an arrest or arrests, the arrests lacked probable cause, or in the alternative, the force was unreasonable for making the arrest.

97.    The Defendants are liable to Plaintiff for assault. Compensatory damages for the pain, suffering, and out of the pocket expenses and lost wages is appropriate.

98.    An award of punitive damages, as to some or all of the Defendants, is also appropriate, as the Defendants acted with a sinister or corrupt motive, such as

hatred, personal spite, ill will, or a desire to injure Plaintiff, or acted under circumstances amounting to a willful and wanton disregard of the Plaintiff's rights.

99.     An award of costs is also appropriate.

## COUNT V – BATTERY
### Seeking Compensatory and Punitive Damages
### (Against all appropriate Defendants, jointly and/or severally)

100.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference or incorporation as if fully set forth herein.

101.    The intentional acts of violence, to include the use of tear gas and the use of OC pepper spray and batons, caused harmful and offensive touching of the Plaintiff.

102.    Those Defendants that were present and encouraged the assault are equally liable for the battery.

103.    Those Defendants that were not present, but who planned, authorized, ratified, or condoned the assault are equally liable for the battery.

104.    Any actions taken by some demonstrators, such as tossing the tear gas cannisters back, was reasonable self-defense or defense of others, as the actions were taken in response to an unprovoked assault or battery, and the conduct of the Defendant was not supported by probable cause.

105.    To the extent the Defendants were trying to conduct an arrest or arrests, the arrests lacked probable cause, or in the alternative, the force was unreasonable for making the arrest.

106.   The Defendants are liable to Plaintiff for battery. Compensatory damages for the pain, suffering, and out of the pocket expenses and lost income is appropriate.

107.   An award of punitive damages, as to some or all of the Defendants, is also appropriate, as the Defendants acted with a sinister or corrupt motive such as hatred, personal spite, ill will, or a desire to injure Plaintiff, or acted under circumstances amounting to a willful and wanton disregard of the Plaintiff's rights.

108.   An award of costs is also appropriate.

## PRAYER FOR RELIEF

**WHEREFORE,** the above premises considered, Plaintiff respectfully prays that this Honorable Court:

A.   Enter declaratory judgment that the Defendants' actions violated the Constitutional rights of Plaintiff, as detailed herein;

B.   General and compensatory damages for Plaintiff for the violations of his federal constitutional and statutory rights and Virginia law, for pain and suffering, for out of pocket expenses, all to be determined according to proof;

C.   An award of attorneys' fees pursuant to 42 U.S.C. § 1988;

D.   Costs of suit;

E.   Pre- and post-judgment interest as permitted by law;

F.   Such other and further relief as the Court may deem just and proper.

**TRIAL BY JURY IS REQUESTED.**

**NATHAN ARRIES**

By Counsel


<u>        /s/ Tim Schulte            </u>
Tim Schulte (VSB #41881)
Blackwell N. Shelley, Jr. (VSB #28142)
Shelley Cupp Schulte, P.C.
3 W. Cary Street
Richmond VA 23220
(804) 644-9700
(804) 278-9634 [fax]
schulte@scs-work.com
shelley@scs-work.com

*Counsel for Plaintiffs*